We'll move to our second argument of the morning. It's in appeal number 222731, Jack Morgan v. The Federal Bureau of Prisons. Ms. Makamova, good morning. Nice to see you. Whenever you're ready. May it please the Court. I am Shirin Makamova of Sudley, Austin for Appellant Jack Morgan. The district court erred when it dismissed Mr. Morgan's claims at the pleading stage before defendants were served. But I would like to begin by addressing Mr. Morgan's standing for injunctive relief, an issue that was raised by the government on appeal. Mr. Morgan has standing to seek injunctive relief because there is a substantial risk that the prison will deny a kosher diet to him once again in the future. There are several reasons for this, and the government's argument— I have a question for you. Is it that the prison will deny a kosher diet to him or that the prison will deny him his choice of food? I'm curious. If you have a prisoner who says, I want kosher meals. I'm Jewish. I want kosher meals. Except I love cheeseburgers and I love turkey logs. So I'm going to eat turkey logs and I'm going to eat cheeseburgers. Does the prison have to say, OK, if your sincerely held religious belief is that you can be kosher and eat cheeseburgers and turkey logs, you're good? Yes, Your Honor. I think this question gets to who gets to define what does the prisoner's religion require. And it's not the prison that gets to define what is kosher under Mr. Morgan's beliefs. That is what he gets to define. So the prison has to feed him whatever he wants is your position? Our position is that Mr. Morgan's claim should be allowed to proceed at the pleading stage. Now, it's a separate question if the government has a compelling interest to deny the cheeseburger or if it is using the least restrictive means to do so. But those are factual questions that the government has to introduce facts and demonstrate, as required by the statute and the case law, that it actually has a reason to deny the cheeseburger. But if that's what Mr. Morgan's religious beliefs require, then at the pleading stage, that is all that is required of him to show substantial burden. So then a plaintiff would always proceed past the pleading stage? Always? As long as pursuant to the well-established case law in the circuit, the plaintiff can show that he was denied a religiously appropriate diet, which in this case Mr. Morgan has. Well, according to his own religious beliefs. I mean, according to his own religion, what he classifies as religion. As long as it's sincere and sincere, we can't test at the pleading stage. There is some case law that says that certain claims and beliefs are not bona fide religions, but that is not what the government has claimed here. There is no dispute that Mr. Morgan's religious beliefs are actually accepted as a religion, even by the government, by the prison. So the only thing that we have here is that purchase of the turkey logs. Yeah, I just wonder if the standing question is, as you defined it by saying it's reasonably likely that he'll be denied a kosher diet in the future. If that's the question, or if the question is, is he likely to be denied a turkey log in the future? What is the standing question? I think the standing question boils down to, is he going to purchase a turkey log again? Because that then answers the question of, is this going to happen to him again? Yeah, or is he going to attempt? That might be right. Mr. Morgan has represented to counsel that he will, consistent with his religious beliefs, purchase things from the commissary. We also have that in the record, where in the complaint he said, I want to be able to avoid this kind of treatment in the future. But is that the standing question? Will he just purchase a turkey log? Isn't the standing question more of, if he purchased the turkey log, are they going to preclude him from eating the kosher diet? I don't think that's really the question in this case, Your Honor, because the government has not disputed actually that the policy under which Mr. Morgan was suspended has changed or that he was suspended in error. All we know from the record before us is that somebody reported Mr. Morgan's purchase of the turkey log, and then he was essentially automatically suspended. Well, I think they have disputed the application of the policy and the fact that the chaplain has discretion. So there's not necessarily an automatic exclusion from it. Your Honor, I think the government's arguments on that point ask the court to draw inferences that are contrary to Mr. Morgan, and that's just not what's allowed under the law. But how is that? If you look at Mr. Morgan's complaint and the attachments to it, they talk quite a bit about the chaplain and the chaplain's role and the chaplain's discretion. So I don't think they're reading in anything into it beyond what's in the attachments. I think we have to go back to the only official form that we have on the record here that was provided to Mr. Morgan, which is the form that notified him that he was being suspended from the kosher diet. And that form is phrased very definitively. It says you will be suspended, and you will be suspended for 30 days. And it does purport to give him two working days to meet with the chaplain. But we don't know from this record, Your Honor, when Mr. Morgan actually received that form, if he had the two days to meet with the chaplain. And even assuming that he did receive it on time, there's nothing in the record to suggest that he refused to meet with the chaplain. But in his own allegations, and I think this was a grievance that he sent that's attached, he alleges that the policy is being abused by the chaplain to restrict the religious exercise of inmates, which suggests to me discretion at the chaplain level. Your Honor, I think we have to remember that Mr. Morgan was proceeding pro se below, so we have to liberally construe all of his claims in his favor. And I read that language as Mr. Morgan's best attempt to describe sort of the injustice that happened to him. We don't even know on this record, because the government was not required to appear below again, what is the actual policy? That was going to be one of my questions. Right. What is the policy? So all we're asking for, Your Honor, is that Mr. Morgan be allowed to proceed and that the court require the government to appear. And the government can, you know, below show to the court that its policy, in effect, either strips Mr. Morgan of standing or that there are other factual questions that prevent Mr. Morgan from receiving relief. That's just not appropriate at the pleading stage and, you know, before the government even had to appear in this case. Ms. MacMillan, I've got some questions on the injunctive relief. Right. He's pro se. He didn't have the benefit of your counsel here. But what he does say, as you know, in his handwritten complaint, he says two things as to the scope, at least as I discern it, as to the scope of the request that he would like, the relief he would like. He asks for the court to order the Federal Bureau of Prisons to discontinue policies governing the involuntary withdrawal of the kosher diet. And then he asks a question a little bit later on that is whether it's beyond the authority of the court to order the BOP to change its policies. How do you interpret what he's asking for? Your Honor, thank you for recognizing at the outset of the question that he was proceeding pro se. Our understanding is that if Mr. Morgan is allowed to proceed below and amend his complaint, that injunctive relief request could be sort of narrowed a little bit and fashioned in a different sense. And the district court also could narrow it. I think it would be appropriate for the district court, for example, issue an injunction that prevents the prison from sort of imposing its own definition of kosher and its own box of what Mr. Morgan is allowed and is not allowed to do. So that would be appropriate and that would be probably the narrowest injunction that Mr. Morgan can get in this case. Okay, so it sounds like what, so yeah, because as drafted, and again, I recognize he's not trained as a lawyer, there's some real breadth to what he's asked for. It almost, it looks facial, not so much as applied, and then it looks prescriptive in the sense of, I don't, I'm not at all sure that we have the authority to require the Bureau of Prisons to promulgate new policies. Of course, Your Honor, and we are not asking the court to affirmatively do that. We're just asking for Mr. Morgan to have a chance to proceed below and the parties can sort of. Okay, so your point is a narrow one. That is that he's alleged enough for imminent injury and therefore it can go forward that way and that he would welcome an opportunity to narrow his request for injunctive relief. Exactly, Your Honor, and I just want to, yes, Your Honor. as opposed to the Bureau of Prisons? Your Honor, our position is that, and this is, again, it bears out in the case law that the government does not get to define for the plaintiff. I understand the position. I'm just trying to understand the scope of the requested injunctive relief, and I thought I heard you say in response to Judge Squatter's question that if you were, you realize that there might be some problems with the breadth of what's been requested to have BOP.  Change things. If I understood you correctly, the modification would be to direct the particular institution where he's serving his time to not impose its own definition of kosher. Your Honor, I think it would have to be a little bit wider. It would have to be directed at the Bureau of Prisons because Mr. Morgan, his claims are based on a system-wide policy, and he has been moved from prison to prison during the pendence of his case. So I think it would be a little bit broader than that, but it would still be specifically applicable to him and to his understanding of what his religion requires. That comes back to the breadth problem. Yeah, the prison, he's now, he's in Terre Haute, right, or he was at some point in Terre Haute. Yes, Your Honor. So I don't know. It's not in the record, and I'm not asking you. I don't have any idea how they implement the kosher diet policy there. I don't know if he's met with the chaplain or not met with the chaplain and said, this is an acceptable item for me. I'm looking for an exemption from the standard diet. So the fact that he is no longer in Thompson is complicating for him, not clarifying for him, at least in my mind. Your Honor, I disagree because I think we have to go back to the form that was provided to Mr. Morgan as to why he was suspended, and that form has three checkboxes. And one of them says you violated your religious diet. That box was not checked by the government. The form that was provided to him simply said that he bought unauthorized commissary. Now, again, from this record, because the government has never appeared below, we don't exactly know how does it define, how does it define unauthorized commissary? How does it decide which box to check? But what we do know from this record, and just drawing all reasonable inferences in Mr. Morgan's favor, we can say that he did not violate his religious beliefs, and the prison suspended him for some sort of disciplinary reason that is outside of what is kosher and what is not kosher. Do we even know if Tara Haute has turkey locks? I'm not sure, Your Honor. But I assume that prison commissaries have standard items across. That might be a big assumption. I'm not sure. Doesn't that assume, doesn't that create a standing problem? How so, Judge? Well, if he claims he's substantially likely to be injured in the future by buying turkey logs, and they don't have turkey logs, what's the problem? Your Honor, I don't think Mr. Morgan's claim is so narrow as to say I want to buy specifically a turkey lock. I think what he's asking for in this case is that he be allowed to act consistent with his religion. Because what happened here is the Bureau of Prison drew a box that said this is kosher. Everything that's inside the box is kosher, and if you step outside that box, then we're going to discipline you and we're going to penalize you. And so it's not so much about the turkey lock per se. It's about Mr. Morgan's religious beliefs and his ability to follow that religion according to his beliefs, not what the Bureau of Prison requires. What if he wants to eat something that is clearly not kosher? I think, Your Honor, that again goes back to the question of who gets to define what is kosher, and the prison does not get to define that for him. And we can dispute sort of whether the prison actually has to provide anything that he wants to eat, but that's a factual question, and the prison can demonstrate below that it has a compelling interest not to provide the item. I don't know that it's a factual question as to whether or not the prison gets to let him eat whatever he wants to eat. That sounds like a legal issue as to do they have to provide the specific type of kosher food he wants. Your Honor, we are not asking the court to affirmatively hold that the prison has to provide the kind of kosher food that Mr. Morgan requires. We're simply asking Mr. Morgan to be able to proceed below to prove his claims. I don't think this is actually a question of law because, again, it goes back to the fact that Mr. Morgan has the prison and the warden were not required to appear below, so we're just working with a very limited record here. You want to save the remainder of your time for rebuttal? Yes, Your Honor. Thank you. Okay. Very well. Mr. Sorgio, good morning. Good morning. May it please the court, I'm Lowell Sturgill from the Department of Justice representing the Bureau of Prisons. There are a number of issues in the case. I'd be happy to take them in any order. At some point, if you could tell us what the policy is, if you know, that would be helpful. So the first place to look is the regulation. The relevant regulation is cited in the Daly case from this circuit and it's 28 CFR 548.20. And it basically says that if a prison finds that an inmate has violated a religious diet, the prison may, and that's the key term, the prison may suspend the privileges. So it's discretionary on the part of the prison. It's not automatic. And so that's the regulations level. Then in terms of the institution, what happened in this case directly reflects that kind of discretion. The form that's key is page 8 of the, I'm sorry, page 7 of the appendix. The notification of inmate religious diet violation. This is the form that the chaplain provided to Mr. Morgan. And the key language in there is if you look at the, there are two boxes, the box that has resolution of the second lower box that says resolution. And there's an explanation, there's a paragraph there. And it starts right off at the beginning. This is a notice of intention to be removed by the chaplain. It's not a notice that he has been removed or automatically would be removed. And then if you read on, if you believe this report is an error, please schedule an interview with the chaplain. And please do so within two days because you notice the form is dated two days before the suspension was set to occur. Yeah, you, I'm thankful that you're raising this point because you mentioned it in your brief as well. And the question I have is, are you making, is it the BOP's contention that he was under a legal obligation before going to federal court to sue to take up the chaplain on that invitation? And if so, what's the source of the legal obligation? Well, the legal obligation is he brought a claim under RFRA, of course. And to make a prima facie case under RFRA, the plaintiff has to show a substantial burden on the free exercise of religion. Our point is the simple one that if he had an opportunity to talk to the chaplain before he was suspended and explain why he shouldn't be suspended, that's a ready alternative that defeats a claim of substantial burden. And we've cited a number of cases from the circuits on that, that support that point. So that's where the legal obligation comes in. Now, you've heard this morning and in the opening brief by counsel that supposedly there's no proof in the record that he actually received the form prior to the suspension. But one thing, I think the most important thing to note is he's been willing to make all sorts of representations in his new counsel written brief about things that are not in the record. For example, it's never been in the record that he thinks a turkey log is kosher. That's something you see for the first time in the brief. He's willing to represent that. But what you don't see, he doesn't represent that he didn't get the form two days before the suspension occurred. So he knows when he got the form and we know that we gave it to him two days before. So the fact that it's not in the record, he's got to, you know. Is there a standing problem here for him because he's now in Terre Haute? So it is the case that the record doesn't show what's available to him at Terre Haute. We don't know if I don't know myself whether they have turkey logs or not. But I think the one point I want to make is he was removed from the religious diet in June of 2021. He was put back on 30 days later. He doesn't allege that he's ever been taken off again. That he's ever had any problems getting just whatever he wants to eat, wherever he is. Whether it's in Thompson or Terre Haute or anywhere else. You'd think that he's willing to make all these representations about what he's willing to eat and not for the first time on appeal. He would tell you. Well, the litigation, though, gets static at some point in time. He files a complaint. It goes to the district court. It comes to us, right? I mean, he's not sending us daily correspondence about his experience in the jail. Well, he seems to be by offering for the first time in his court of appeals brief what he's willing to eat and what he's not. And what he thinks is kosher and what he's not. That wasn't before the district court. What happened in the district court is he filed really an astonishingly broad complaint. And what the complaint says is that no matter what I do, you can't take me off the special religious diet. That's what he says. And if you look at the administrative remedy request that he submitted to show that he exhausted his administrative claims, it says the same thing. Do you agree if he had been punished for eating something that he sincerely believed was kosher by being removed from his kosher diet, that that would have been a violation of the statute? So not here again because he had an opportunity to explain to the chaplain why he shouldn't have been removed from the diet. He didn't take advantage of it. That's an alternative that was available to him. And that demonstrates that. What if that alternative had not been available to him? Then I think it's a different case. And maybe he can show a substantial burden. But would that alternative be a factual issue? So not in this case, because, again, he hasn't even alleged that he didn't get the form in time. He says that the record doesn't show it. But honestly, I think he's being a little cagey here. He says, OK, I think kosher. I think Turkey is kosher for the first time on appeal. But he won't tell you whether he actually got the form, which he put the form in the amended complaint. We didn't put that in the record. He put it in the record. That doesn't necessarily answer when he got it, though. That's correct. So anyway, the claim in the case is astonishingly broad. And there are cases that I believe are even cited in the House and Senate reports on RFRA where prisoners wanted to have steak and wine. And my religion says I have to have steak and wine every week. And that kind of thing, prisoners do. I'm not anti-prisoner, but they will do what they can. And the courts say, well, that's clearly not religious. That's not what RFRA was meant to allow. But that's essentially where he puts you. And I think that— Well, the turkey log's a little different than steak and wine. Right. I'm making steak and wine as kind of an illustration of where this would lead. And if you take his claims to the logical conclusion, that's where you end up. He gets to do what he wants, and the prison can't ever take him off the special religious diet. That's what his complaint says. I mean, there's a second part of the test in terms—it's not whatever he wants goes, right? The institution gets to respond to that as far as the burden it would put on the institution, the availability of certain items, et cetera. Right. So even if— That's why the filet mignon cases fail. Because even if somebody comes in and says, this is part of my religion, I have to eat steak every other day. Great. It's part of your religion. Doesn't mean the steak is going to be delivered. So that is true. I do think some of the steak and wine cases also say this is so outrageous that it's just not a sincere religious belief. So I think we win under either prong. That was my point about the turkey log, though. That's not—some places acknowledge or consider turkey kosher. So to question at the pleading stage the sincerity of eating a turkey log sounds like an issue of fact to me. So that's why in this case the form is important because he was not actually removed from— he caused his own removal by not going to the chaplain and saying, oh, by the way, my religion says I think that a turkey log is kosher. He never did that. So that's why they removed him. What does unauthorized commissary mean? That's what the box—that's the box that is checked. So the first thing to know is that the form itself, which I could find in a minute, the top of the form says—it's a notice of inmate religious violation. So the whole form is talking about what happens when the prison determines that an inmate may have violated some religious beliefs. So unauthorized commissary means what happened was the chaplain went through the records of which inmates had purchased which items from the commissary. They found that Morgan had purchased a turkey log, which is not kosher. So then the chaplain said, oh, please come in and explain to me what's going on. Do you still—as you look at the form, what it says is do you still need to be on this special religious diet because you seem to be eating things that are not kosher? Yeah, I mean what you're—you're not using these words, but you're basically saying because of that outlet available to him with the chaplain, there's an embedded exhaustion requirement. So, I mean, I wouldn't put it that way because Riffer doesn't have an exhaustion requirement. No, no, it's functional. It's kind of functional. It's exhaustion, right? I mean he had—your point is that he had this alternative outlet. What's the outlet? Go talk to the chaplain, have a discussion about your diet, and see if you can get an exemption or some relief from the way the policy is being currently implemented. He didn't do that. So I think that's right. I think we would much prefer you reach that result under the substantial burden prong of Riffer because I think that's where it fits given that Riffer doesn't have an exhaustion requirement, but you're right. Why not under the standing prong? Why not under the standing prong? Yes. It was not substantially likely to occur again. Exactly. Because he didn't afford himself these available opportunities. There's a difference between a turkey leg and filet and wine, right? I mean, it's possible that he—look, it's possible that somebody who is Jewish and eats a kosher meal or defines—they may define—an individual may define kosher different than— an individual here may define kosher different than an individual living somewhere else, I mean, according to their religious practices. And he can explain that to the chaplain and perhaps the chaplain will agree or will disagree. Exactly. But he can't say that it's substantially likely that he's going to be suspended again without affording him— without having afforded himself the opportunity to take advantage of the program that the prison allows to create an exemption. Yes. That's the way I understand the standing argument. Yes, that's it. And there's a— Go ahead. There's a different chaplain now as well, correct, at Terre Haute? Right. I have— The Terre Haute part of this adds complexity to it. Yeah. It does. Or at least complexity from his perspective in my view. If I could, Your Honor, I have two minutes and a little left, and there's a second big issue in this case that they've raised, which is whether the RFRA waives the United States sovereign immunity for damages. Right. I don't want to sit down with at least getting to that and ask if you have any questions. I can—I mean, the basic point is that every circuit that's addressed this question has held that RFRA does not waive the United States sovereign immunity for damages. In Sossaman, the Supreme Court held that RLUIPA, which is a sister statute to RFRA, does not waive the state's sovereign immunity. And what the Supreme Court said is directly applicable here. The court said appropriate relief, which is the key term, is open-ended and ambiguous about what types of relief it includes. The context here, whether the defendant is a sovereign, suggests, if anything, that monetary damages are not suitable or proper. So that rationale maps directly onto RFRA, as all the circuits have held. So for that reason, we believe that— And your added point, I think—correct me if I'm wrong. At least I took this away from your brief—is that Tanzen versus Tenier doesn't change that at all. That's correct. In fact, Tanzen drove the last nail in the coffin of this by saying that, quote, the obvious difference between damages versus individual federal officials, which was the question issue there, and the federal government itself. That's about as strong a signal from the court as you get for an issue that wasn't in the case. The plaintiffs rely on two cases, Clark versus Martinez and Santos, which say that typically courts don't read a single term in the same statute to mean two different things in two different contexts. But neither of those cases was a sovereign immunity case, and sovereign immunity is different. You have to have a clear waiver. They also ask you to reinstate the individual capacity claims against Warden Scioli. I represent him in his individual capacity. The court shouldn't do that. As the district court correctly yelled, he was named in the caption, but the body of the complaint never said anything about him and what his personal involvement was. And with that kind of allegation that he cannot be added back in, and he had his ‑‑ Morgan had two ‑‑ he did a complaint. Then he complained. The district court said, I think we've seen enough. He's done the best he can. And so for that reason, you shouldn't reinstate the claims against the warden. I have all of 10 seconds left, which I don't really have anything extra unless ‑‑ No, we understand your position. Thank you very much, Mr. Zirkle.  I'll give you a couple minutes on rebuttal here. Thank you, Judge Ketter. I would like to address this issue of the forum providing an opportunity, allegedly, for Mr. Morgan to meet with the chaplain. So the government just conceded that if Mr. Morgan was not given an opportunity to meet with the chaplain, then that would be a different case. And our argument is that that is exactly the case here. Blackletter law requires the court to draw reasonable inferences in Mr. Morgan's favor. If the court concludes today that Mr. Morgan had an opportunity to meet with the chaplain but declined that opportunity, it would be drawing inferences against Mr. Morgan, and that is simply not allowed. What about the inference going forward? Now that we know what the forum says, Mr. Morgan knows what the forum says, the forum clearly says you can meet with the chaplain. So from a standing standpoint, you may have a solid argument on the event that's already occurred, but going forward from a standing standpoint, how do you get around that language? Your Honor, one of the points that we still don't know, whether going forward or in the past, is when is this forum actually delivered? Does the person have two days to actually meet with the chaplain? How does the interview go? There are all these questions that are unanswered. But this forum clearly says, talk about future only, again, for standing purposes, this forum clearly advises him that he has the opportunity to meet with the chaplain for an interview within two days to determine whether or not suspension is appropriate. I think Your Honor would have to assume, again, that Mr. Morgan would actually receive the forum on time and have the opportunity to meet with the chaplain, and the record just does not bear that out. That's all that I have. Unless Your Honors have any more questions, we ask that the court vacate the judgment and remand the case for further proceedings. Okay. Very well. Ms. Mockimova, I see here that you took the case on appointment from the court. Yes, I did. We very much appreciate that. You've done a very fine job. Mr. Hockman, it's nice to see you. We appreciate your firm accepting the appointment, and we'll take the appeal under advisement.